THE HONORABLE JOHN C. COUGHENOUR

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ELSIE COLLAZO, | CASE NO. C13-0892-JCC |
| Plaintiff, | ORDER |
| v. | |
| BALBOA INSURANCE COMPANY, an insurance company, | |
| Defendant. | |

This matter comes before the Court on Plaintiff Elsie Collazo's motion for partial summary judgment. (Dkt. No. 23.) Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS IN PART and DENIES IN PART the motion for the reasons explained herein.

I.      BACKGROUND

        A.  Factual Background

        Ms. Collazo entered into a "reverse mortgage" for her home in Tacoma, WA with Financial Freedom in 2009. (Dkt. No. 23, Ex. 1-D at 1.) Financial Freedom subsequently obtained a residential property fire insurance policy on Ms. Collazo's residence with Defendant Balboa Insurance Company ("Balboa") on November 10, 2009. (*Id.*) On May 21, 2010, an accidental fire in an upstairs bedroom damaged the house. (Dkt. No. 23 at 22.) After Balboa was notified, it sent a local independent adjuster, Dean Perryman, to inspect the property. (Dkt. No.

30, Ex. 2-9.) During this inspection, Mr. Perryman noted damage that he believed pre-dated the fire. (Dkt. No. 32 at 11.) Based on Mr. Perryman's estimate, Balboa paid Financial Freedom $30,920.37 on July 1, 2010. (Dkt. No. 31, Ex. 12 at 1.) On August 30, 2010, Ms. Collazo notified Balboa that the funds were insufficient to complete the necessary repairs, because Mr. Perryman did not account for all damages to her house in his estimate. (Dkt. No. 30, Ex. 2-6 at 9.) Mr. Perryman re-inspected Ms. Collazo's house on September 2, 2010, (Dkt. No. 31, Ex. 13), and Balboa paid Financial Freedom an additional $5,985.54 on September 28, 2010. (Dkt. No. 31, Ex. 15.) Through April 2012, Financial Freedom forwarded a total of $29,708.73[1] to Ms. Collazo to pay for repairs. (Dkt. No. 31, Ex. 16 at 3.)

Ms. Collazo disagreed with both of Mr. Perryman's damage assessments, and believed that the funds disbursed by Balboa and Financial Freedom were insufficient to complete the necessary repairs. (Dkt. No. 23 at 23, ¶ 11.) Ms. Collazo obtained estimates of the cost of repairs from several other contractors that ranged from $75,000 to $170,000. (*Id.*) Due to her belief that the disbursed funds were inadequate to fix the damage, Ms. Collazo attempted to complete the repairs with help from her children and "cheap materials." (*Id.* at ¶ 12.) After September 28, 2010, both parties claim that they repeatedly attempted to contact the other side and received little to no response. (Dkt. No. 23 at 24, ¶ 16; Dkt. No. 31, Ex. 16 at 1.) Ms. Collazo maintains that she made repeated requests for additional funds and inspections that went ignored by Balboa, (Dkt. No. 23 at 24, ¶ 16,) and Balboa claims that it responded to these calls with requests for documentation of completed repairs, which Ms. Collazo did not provide. (Dkt. No. 30, Ex. 2-6 at 4–5.)

After retaining counsel, Ms. Collazo obtained a detailed estimate from contractor Bernie Williams on April 11, 2012, which estimated that it would cost $348,605 to complete the repairs. (Dkt. No. 23, Ex. 1-A.) Balboa then retained counsel, and requested the opportunity to inspect

---

[1] Financial Freedom withheld $7,197.18, the remainder of the unpaid balance Financial Freedom received from Balboa, to be paid upon a post-repair inspection.

1   the home, as well as any documentation relating to repairs. (Dkt. No. 23, Ex. 2-M at 1.) On July

2   9, 2012, Ms. Collazo formally demanded an appraisal.[2] (Dkt. No. 23, Ex. 2-N.) Balboa

3   responded on August 15, 2012 by appointing its own appraiser. (Dkt. No. 23, Ex. 2-O.) Over the

4   next several months, the parties and their appraisers exchanged calls and meetings until Balboa

5   concluded that Ms. Collazo was ineligible to demand an appraisal and withdrew from the process

6   in November 2012. (Dkt. No. 23, Ex. 2-Q at 6.)

7   **B. Insurance Contract Terms**

8   The insurance contract at the core of this dispute contains several clauses relevant to this

9   analysis. First, the "Insuring Agreement" clause states that:

10
11      Balboa Insurance Company, hereinafter referred to as the "Company" in
        consideration of the premium and subject to the limits of liability, exclusions,
        conditions and other terms of this Policy, agrees to indemnify the Named Insured
12      and its legal representatives, hereinafter referred to as the "Insured," for any
        amount which the Insured may be entitled to recover as respect to existing
13      mortgages for which the required insurance policies have not been delivered to
        the Insured on or before the expiration or cancellation of the existing insurance.
14      The mortgagor of the property covered hereunder, hereinafter referred to as the
        "Borrower," shall be considered an additional insured with respect to any residual
15      amounts of insurance over and above the insurable interest of the Insured in said
        property.

16   (Dkt. No. 23, Ex. 1-D at 11.)

17   Second, the "Appraisal" clause states that "If you and we[3] fail to agree on the amount of

18   loss, either may demand an appraisal of the loss." (*Id*. at 18.)

19   **II.   DISCUSSION**

20   Pursuant to Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant

21   summary judgment if the movant shows that there is no genuine dispute as to any material fact

22   and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making such

23

24   _____

25   [2] Although Ms. Collazo named Robert Howson as her appraiser on July 9, he was initially retained by Ms.
     Collazo on February 11, 2012, approximately five months prior to Ms. Collazo's appraisal demand. (Dkt. No. 23,
     Ex. 2-Q at 1.)

26   [3] The "Definitions" section specifies that "you" refers to the Named Insured, Financial Freedom,
     "Borrower" refers to Ms. Collazo, and "we" refers to Balboa. (Dkt. No. 23, Ex. 1-D at 12.)

ORDER
PAGE - 3

a determination, the Court must view the facts and justifiable inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made and supported, the opposing party "must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248–49. Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888–89 (1990). Ultimately, summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

Federal courts sitting in diversity jurisdiction apply state substantive law and federal procedural law. *Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415, 427 (1996). "In Washington, insurance policies are construed as contracts." *Weyerhaeuser Co. v. Commercial Union Ins. Co.,* 15 P.3d 115, 122 (Wash. 2000) (*internal citation omitted*). The terms of an insurance contract are examined to determine whether, under the plain meaning of the contract, there is coverage. *Kitsap County v. Allstate Ins. Co.,* 964 P.2d 1173, 1178 (Wash. 1998). "Insurance contracts are construed in accordance with the meaning understood by the typical purchaser of the insurance." *Sprague v. Safeco Ins. Co. of America,* 276 P.3d 1270, 1272 (Wash. 2012). When a policy term is undefined, it must be given its "plain, ordinary, and popular" meaning. *Kitsap County*, 964 P.2d at 1177. A term will be deemed ambiguous if it is susceptible to more than one reasonable interpretation. *Id.* To help resolve ambiguity, the court may look to context and the intent of parties. *Quadrant Corp. v. Am. States Ins. Co.*, 110 P.3d 733, 737

(Wash. 2005). Any remaining ambiguity must be construed against the insurer and in favor of the insured. *Holden v. Farmers Ins. Co. of Washington*, 239 P.3d 344, 347 (Wash. 2010).

### A.     Third Party Beneficiary

Ms. Collazo first moves for summary judgment on the grounds that she is a third-party beneficiary to the contract between Financial Freedom and Balboa and so has standing to enforce the contract. In Washington, a party is a third-party beneficiary to a contract when both parties "intend that the promisor assume a direct obligation to the intended beneficiary at the time they enter into the contract." *Postlewait Const., Inc. v. Great Am. Ins. Companies*, 720 P.2d 805, 806 (Wash. 1986) (citing *Lonsdale v. Chesterfield*, 662 P.2d 385 (Wash. 1983). Party intent is measured objectively, and a party intends to enter into a third-party beneficiary contract when "performance under the contract would necessarily and directly benefit" that party. *Id*. at 807 (internal quotations omitted). "A third party for whose direct benefit a contract was entered into may sue for breach thereof." *Lonsdale*, 573 P.2d at 825. Ms. Collazo argues both that the insurance contract explicitly designated her as an additional insured, and that performance of the contract would necessarily and directly benefit her. (Dkt. No. 23 at 12.) Balboa contends that Ms. Collazo is an incidental beneficiary with no right to enforce any of the terms of the contract. (Dkt. No. 29 at 10–11.)

Ms. Collazo has the better of the arguments. First, the language of the contract clearly states that Ms. Collazo is an "additional insured" under the policy. (Dkt. No. 23, Ex. 2-D at 11.) *Postlewait* makes it clear that an additional insured is generally considered a third-party beneficiary to a contract. *See Postlewait*, 720 P.2d at 806 (stating that a lessor of cranes was not a third-party beneficiary because it was not an additional insured). Second, both parties intended Balboa to assume a direct obligation to Ms. Collazo, as demonstrated by the fact that the contract grants her an interest in "any residual amounts of insurance over and above the insurable interest in said property." (Dkt. No. 23, Ex. 2-D at 11.) Although Balboa argues that *Childress v. Liberty Mutual Fire Insurance Company*, No. C10-059-RSL, 2011 WL 1832709 (W.D. Wash. May 12,

1    2011) controls in this case, its reliance is misplaced. First, the contract at issue in *Childress*

2    explicitly defined the borrower as a simple loss payee, and specified that the borrower had no

3    other rights under the contract. 2011 WL 1832709 at *1. Second, the coverage letter sent to the

4    borrower in *Childress* stated that the insurance only protected the lender's interest in the

5    property. *Id*. In this case, the contract contains no such limitations of Ms. Collazo's status, and

6    the coverage letter contains no such language. (Dkt. No. 23, Ex. 2-D at 11; Dkt. No. 23, Ex. 1-

7    C.) Accordingly, the Court finds that there is no genuine issue of material fact on this issue, and

8    that Ms. Collazo is a third-party beneficiary of the contract between Balboa and Financial

9    Freedom.

10              **B.      Good Faith and Insurance Fair Conduct Act**

11              Ms. Collazo next moves for summary judgment on the grounds that Balboa breached its

12   duty of good faith and violated the Insurance Fair Conduct Act of Washington. Insurance bad

13   faith claims are analyzed by applying the "same principles of any other tort: duty, breach of that

14   duty, and damages proximately caused by any breach of duty." *Smith v. Safeco Ins. Co.*, 78 P.3d

15   1274, 1277 (Wash. 2003). To prevail on a breach of the duty of good faith claim, the insured

16   must prove that the insurer's breach of the insurance contract was "unreasonable, frivolous, or

17   unfounded." *Mut. of Enumclaw Ins. Co. v. Dan Paulson Const., Inc.*, 169 P.3d 1, 8 (Wash.

18   2007). The presence or absence of bad faith is a question of fact. *Smith*, 78 P.3d at 1277. If

19   reasonable minds could disagree as to whether an insurer's conduct was reasonable, or if there

20   are material issues of fact with respect to the reasonableness of the insurer's action, then

21   summary judgment is not appropriate. *Dees v. Allstate Ins. Co.*, 933 F. Supp. 2d 1299, 1307

22   (W.D. Wash. 2013) (citing *Smith*, 78 P.3d at 1277–78). Similarly, Washington's Insurance Fair

23   Conduct Act ("IFCA") allows a "first party claimant" of an insurance policy to bring an action

24   against an insurer who "unreasonably denied a claim" for coverage or benefits. Wash. Rev. Code

25   § 43.30.015 (2014).

26

Ms. Collazo is not entitled to summary judgment on these grounds. Ms. Collazo argues that Balboa acted in bad faith and violated the IFCA because it failed to communicate with her, did not personally inspect the damage, and refused to pay her the full amount of Mr. Williams' estimate. (Dkt. No. 23 at 14–15.) Balboa counters that it diligently communicated with Ms. Collazo, sent an appraiser to inspect the house multiple times, and rightfully refused to pay the full amount because Mr. Williams' estimate was excessive. (Dkt. No. 29 at 16–17.) Both parties put forward sufficient evidence that a reasonable jury could find for either side. (*See* Dkt. 23, Ex. 1 at 23, ¶¶ 11, 16 (Ms. Collazo's declaration that Balboa ignored her contacts); Dkt. 30, Ex. 1 at 77–78 (Balboa's internal logs noting attempts to contact Ms. Collazo to obtain additional records).) Additionally, the wide variation between the parties' evaluation of the damage to Ms. Collazo's home creates a genuine issue of fact as to the extent of the damage. As such, summary judgment is inappropriate. *See Anderson*, 477 U.S. at 248–49.

## C.      Appraisal

Finally, Ms. Collazo moves for summary judgment on the grounds that she has the right to demand an appraisal, and even if she did not have such a right, Balboa should be equitably estopped from withdrawing from the appraisal process. (Dkt. No. 23 at 15–18.)

### 1.  Right to Appraisal

Ms. Collazo argues that she has the right to an appraisal because Washington law requires that an "insured" be able to demand an appraisal, and she is such an insured. (Dkt. No. 23 at 17.) Balboa argues that Ms. Collazo lacks standing to invoke the appraisal provision because the insurance contract limits such an action to the "Named Insured," which the contract lists as Financial Freedom. (Dkt. No. 29 at 18–19.) Washington law requires that fire insurance policies be "not less favorable to the insured than the 'standard fire policy.'"[4] Wash. Admin. Code § 284-20-10(3)(d) (2014). If a policy is found to be less favorable, the standard fire policy

---

[4] By "standard fire policy," the Washington Administrative Code is referring to the 1943 New York Standard Fire Insurance Policy. Wash. Admin. Code § 284-20-10(3).

governs. *Id*. The standard fire insurance policy grants both the insured and the insurer the right to demand an appraisal if the parties are unable to reach an agreement on the value of the damage. (Dkt. No. 23, Ex. 2-O.) *See also* N.Y. Ins. Law § 3404 (McKinney, 2010). The insurance policy in question does appear to limit the right to appraisal to the Named Insured, Financial Freedom. (*See* Dkt. No. 23, Ex. 1-D at 18.) This limitation renders Balboa's policy less favorable to the insured than the standard fire policy, and so the standard policy controls. Wash. Admin. Code § 284-20-10(3)(d). Accordingly, the key issue is whether a third-party beneficiary, such as Ms. Collazo, qualifies as an "insured" under the standard fire policy.

Because the standard fire policy does not define the word "insured," the Court must interpret it based upon its "plain, ordinary, and popular" meaning. *See Kitsap County*, 964 P.2d at 1177. Generally, the word "insured" is defined as "a person whose life, property, etc. is insured against loss." Webster's New World Dictionary 701 (3d ed. 1988). *See also* Black's Law Dictionary (9th ed. 2009) (an "insured" is "[a] person who is covered or protected by an insurance policy.") Ms. Collazo's status as a third-party beneficiary enables her to access all of the benefits available to the insured under the contract, and so she is an "insured" under the plain, everyday meaning of that term. *See Lonsdale*, 573 P.2d at 825.

Moreover, well-settled Washington law requires that any ambiguities that cannot be resolved by looking at the entirety of the contract be resolved in favor of the insured. *See Holden*, 239 P.3d at 347. This rule of construction "is no less applicable for a policy provision approved or mandated by the insurance commissioner, as in a fire insurance policy." *Id.* at 347 n.2. Accordingly, even if it were ambiguous whether the term "insured" in the standard fire insurance policy includes third-party beneficiaries, the Court would be obliged to interpret the term in the manner most favorable to Ms. Collazo.

The Court finds that Ms. Collazo has the right to demand an appraisal.

**2.      Remedy**

Next, the Court must determine whether to instruct the parties to recommence the

appraisal process, or grant Ms. Collazo a default appraisal judgment based on Mr. Williams'
valuation. (Dkt. No. 23 at 21–22.) The Court declines to grant a default judgment because the
total value of the loss is in dispute, which renders such a determination inappropriate at this time.
Rather, the Court instructs both parties to re-initiate appraisal proceedings.[5]

**III.    CONCLUSION**

For the foregoing reasons, Plaintiff's motion for partial summary judgment, (Dkt. No.
23), is GRANTED IN PART and DENIED IN PART, as specified above.

DATED this 1st day of May 2014.

John C. Coughenour
UNITED STATES DISTRICT JUDGE

---

[5] The Court declines to appoint an umpire at this time. However, the Court asks that the parties submit a joint status report by June 6, 2014, regarding the status of the appraisal. The Court has already expressed its concern regarding the relationship between the attorneys in this matter. (*See* Dkt. No. 27 at 5–6.) Nothing the Court has seen since that date has alleviated those concerns. Accordingly, the Court reserves the right to appoint an umpire, or otherwise supervise the appraisal process, as it deems necessary.

ORDER
PAGE - 9