The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT WESTERN DISTRICT OF
WASHINGTON AT SEATTLE

| | |
|---|---|
| ELSIE G. COLLAZO,<br><br>                              Plaintiff,<br><br>v.<br><br>BALBOA INSURANCE COMPANY, an<br>insurance company,<br><br>                              Defendant. | NO. CV 13-00892 JCC<br><br>**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT RE: VIOLATIONS OF THE INSURANCE FAIR CONDUCT ACT AND CONSUMER PROTECTION ACT**<br><br>**Note on motion calendar:**<br>**December 12, 2014** |

## I. RELIEF REQUESTED

Plaintiff respectfully requests that the Court make the following findings as a matter of law:

1) That Balboa violated WAC 284-30-330(7) when it compelled Collazo to institute the appraisal clause and file this lawsuit in order to obtain substantially more money than what Balboa had offered during the subject insurance claim.

2) That Balboa violated WAC 284-30-330(3), 330(14), and 360(2) when it knowingly refused to respond a letter of representation from Collazo's public

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT RE: VIOLATIONS OF THE INSURANCE FAIR
CONDUCT ACT AND CONSUMER PROTECTION ACT — 1

NO. CV 13-00892 JCC

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW
SUITE 480
MOUNTLAKE TERRACE, WA 98043
425.582.5636

adjuster, Bud Dyer, thereby preventing him from assisting in the resolution of her insurance claim.

3) That Balboa's unreasonable denial of benefits and/or violation of the WAC insurance regulations constituted a violation of the Washington Insurance Fair Conduct Act (IFCA).

4) That Balboa's violation of the WAC insurance regulations constituted a violation of the Washington Consumer Protection Act (CPA).

## II. INTRODUCTION

Balboa offered Collazo up to $45,563 Replacement Cost and paid her about $36,900 Actual Cash Value for the cost of repairing her house. An appraisal panel has recently determined that the correct cost of repairs was $150,000 for Replacement Cost and $96,229.86 for Actual Cash Value. The appraisal panel also found that the anticipated $150,000 cost of repairs would be substantially increased as a result of the ordinance or law coverage, which Balboa had previously denied. This Court has already found that Balboa wrongfully denied coverage for overhead and profit, wrongfully denied the benefit of the appraisal process, and applied a false deductible amount. Balboa's low payment and multiple breaches of the insurance contract constituted an unreasonable denial of insurance benefits, which violated the IFCA.

Additionally, during the insurance claim Collazo retained a licensed public adjuster, Bud Dyer, to represent her interests and negotiate with Balboa. WAC 284-30-330(14) required that insurance companies work with public adjusters. But Balboa refused to respond to Dyer's letter of representation on the basis that it was not signed by Collazo. Balboa admits it never actually

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT RE: VIOLATIONS OF THE INSURANCE FAIR
CONDUCT ACT AND CONSUMER PROTECTION ACT — 2

NO. CV 13-00892 JCC

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW
SUITE 480
MOUNTLAKE TERRACE, WA 98043
425.582.5636

told Dyer that it needed such a signature. Balboa's refusal to communicate with Dyer violated WAC 284-30-330(2) and 360(3), which required that an insurer respond to communications from a claimant's representative.

After Balboa ignored Dyer's letter of representation, Collazo sent Balboa a $348,605 estimate from a contractor, Bernie Williams. Balboa failed to show the estimate to the lead adjuster on the claim, Glenn Geathreaux, or to the independent adjuster, Dean Perryman. Both men testified that if they had known about the estimate they would have worked with Williams to reach an agreement on the cost of repairs. Since Balboa ignored the Williams estimate, Collazo had no choice but to initiate the appraisal process pursuant to the terms of the contract.

Balboa stopped the appraisal process when it realized that its estimate had been much too low. Collazo then had no choice but to file this lawsuit in order to force Balboa to participate in the appraisal process. Ultimately, the appraisal panel awarded Collazo more than three times the amount offered by Balboa. This triggered WAC 284-30-330(7), which is violated when an insurer compels a claimant to institute appraisal or litigation in order to recover substantially more than what the insurer had originally offered.

Balboa's violations of WAC 284-30-330(3), 330(14), 360(2), and 330(7) constitute, as a matter of law, violations of the IFCA and CPA.

## III. FACTS

### A.    Facts Already Known to the Court

The following facts are taken directly from the Court's May 1, 2014 order:

On May 21, 2010, an accidental fire in an upstairs bedroom damaged Collazo's house.

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT RE: VIOLATIONS OF THE INSURANCE FAIR
CONDUCT ACT AND CONSUMER PROTECTION ACT — 3

NO. CV 13-00892 JCC

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW
SUITE 480
MOUNTLAKE TERRACE, WA 98043
425.582.5636

(Dkt. No. 23 at 22.) After Balboa was notified, it sent a local independent adjuster, Dean Perryman, to inspect the property. (Dkt. No. 30, Ex. 2-9.) During this inspection, Perryman noted damage that he believed pre-dated the fire. (Dkt. No. 32 at 11.) Based on Perryman"s estimate, Balboa paid Financial Freedom $30,920.37 on July 1, 2010. (Dkt. No. 31, Ex. 12 at 1.) On August 30, 2010, Collazo notified Balboa that the funds were insufficient to complete the necessary repairs, because Perryman did not account for all damages to her house in his estimate. (Dkt. No. 30, Ex. 2-6 at 9.) Perryman re-inspected Collazo's house on September 2, 2010, (Dkt. No. 31, Ex. 13), and Balboa paid Financial Freedom an additional $5,985.54 on September 28, 2010. (Dkt. No. 31, Ex. 15.) Through April 2012, Financial Freedom forwarded a total of $29,708.731 to Ms. Collazo to pay for repairs. (Dkt. No. 31, Ex. 16 at 3.)

Ms. Collazo disagreed with both of Mr. Perryman's damage assessments, and believed that the funds disbursed by Balboa and Financial Freedom were insufficient to complete the necessary repairs. (Dkt. No. 23 at 23, ¶ 11.) Ms. Collazo obtained estimates of the cost of repairs from several other contractors that ranged from $75,000 to $170,000. (*Id.*) Due to her belief that the disbursed funds were inadequate to fix the damage, Ms. Collazo attempted to complete the repairs with help from her children and "cheap materials." (*Id.* at ¶ 12.) After September 28, 2010, both parties claim that they repeatedly attempted to contact the other side and received little to no response. (Dkt. No. 23 at 24, ¶ 16; Dkt. No. 31, Ex. 16 at 1.) Ms. Collazo maintains that she made repeated requests for additional funds and inspections that went ignored by Balboa, (Dkt. No. 23 at 24, ¶ 16.) and Balboa claims that it responded to these calls with requests for documentation of completed repairs, which Ms. Collazo did not provide. (Dkt. No. 30, Ex. 2-

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT RE: VIOLATIONS OF THE INSURANCE FAIR
CONDUCT ACT AND CONSUMER PROTECTION ACT — 4

NO. CV 13-00892 JCC

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW
SUITE 480
MOUNTLAKE TERRACE, WA 98043
425.582.5636

6 at 4–5.)

**B.     Balboa Breached the Contract and Wrongfully Denied Coverage for Overhead and Profit**

This Court has ruled that, during the insurance claim, Balboa incorrectly applied a $1,000 deductible and wrongfully denied coverage for the estimated cost of a contractor's overhead and profit. (Dkt. No. 65.)

Additionally, Balboa's adjuster, Glenn Gauthreaux, took the position that there was no possible coverage for ordinance or law. (Dkt. No. 58 at 61-67.) Balboa instructed Perryman not to consider ordinance or law "code" costs in his estimate. (Dkt. No. 58 at 143.) This Court has found that there may be coverage for the costs of complying ordinance and law, but that there is a dispute as to whether there will be any increased costs resulting from ordinance and law compliance. (Dkt. No. 65.)

**C.     Facts Not Yet Presented to the Court**

Around November 26, 2011, Collazo retained a public adjuster (PA), Bud Dyer, to represent her interests and negotiate with Balboa on her behalf. (*See* Declaration of Joel Hanson Exhibit A.) On November 26, 2011, Dyer sent Balboa a letter explaining that he represented her and that future communications should be directed to him. (Hanson Decl. Ex. A.) Dyer also requested a copy of the insurance policy and any repair specifications. (Hanson Decl. Ex. A.)

An internal note dated December 2, 2011 confirmed that Balboa had received Dyer's letter but determined that no action could be taken without a verifying signature. (Hanson Decl. Ex. B.) Another internal note explained that, "On 12/02/2011, we rcvd [sic] a letter indicating borrower had hired a PA but we did nothing on because it didn't have a signature on the

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT RE: VIOLATIONS OF THE INSURANCE FAIR
CONDUCT ACT AND CONSUMER PROTECTION ACT — 5

NO. CV 13-00892 JCC

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW
SUITE 480
MOUNTLAKE TERRACE, WA 98043
425.582.5636

retention page." (Hanson Decl. Ex. C.) The remaining records in Balboa's claim file show that no response was ever made to Dyer and he was never told that he needed to submit a signature. (Hanson Decl. ¶ 6.) Gauthreaux testified that he would not normally reject Dyer's letter without at least calling him to explain why. (Hanson Decl. Ex. D - Gauthreaux Deposition at 116-118.) But that did not happen here. (*See id.*) Plaintiff's insurance claim handling expert, Gary Williams, has opined that Balboa's refusal to communicate with Dyer made it inevitable that Collazo would need to demand appraisal in order to resolve the claim. (Hanson Decl. Ex. E – Gary Williams Report at 8.)

When Balboa refused to respond to Dyer, Collazo turned to attorney Michael Watkins to assist her. On April 25, 2012, Watkins sent Balboa a letter notifying it that it had violated the Insurance Fair Conduct Act. (Dkt. No. 23-2 at 56.) Enclosed with that letter was an estimate from restoration contractor Bernie Williams of Aspirant Consulting Group. (Dkt. No. 23-2 at 56.) The Aspirant estimate predicted the cost of repairs would be $348,605. (Dkt. No. 23-1 at 2-87.) On May 14, 2014, Shannon Grizzle, an employee of QBE First, sent a letter in response to Watkins. (Dkt. No. 23-2 at 59.) Grizzle explained that QBE First had purchased the assets and liabilities of Balboa Insurance Company. (*Id.*) Grizzle stated that the Bernie Williams estimate had been received by email on April 10, 2012 and had been forwarded to "the assigned claims representative", presumably Gauthreaux. (*Id.*) Upon reviewing the estimate, the claim representative had somehow concluded that it contained repairs unrelated to the loss. (*Id.*) Grizzle's statement turned out to be false. Gauthreaux testified that Balboa never forwarded him a copy of the Bernie Williams estimate. (Hanson Decl. Ex. D - Gauthreaux Dep. at 119-20.) He

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT RE: VIOLATIONS OF THE INSURANCE FAIR
CONDUCT ACT AND CONSUMER PROTECTION ACT — 6

NO. CV 13-00892 JCC

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW
SUITE 480
MOUNTLAKE TERRACE, WA 98043
425.582.5636

1   never saw that estimate until the day of his deposition on June 19, 2014. (*Id.*) Gauthreaux

2   testified:

3       Q   If you had seen this estimate, would you have asked Mr. Perryman to go back to the

4       loss site and try and reconcile the differences with Mr. Williams?

5       MS. WESS:   Object to form.

6       BY MR. HANSON:

7       Q   But you never saw this estimate.  Correct?

8

9       A   Correct.

10      Q   And that would be standard procedure, for you to have him go back to the loss site

11      and meet with Mr. Williams.  Correct?

12      MS. WESS:       Object to form.

13      A   Correct.

14      BY MR. HANSON:

15      Q   And that would be so they could attempt to reach an agreement on the scope and cost

16      of repairs?

17

18      A   Correct.

19      Q   If Balboa received a copy of this estimate, should it have gone to you?

20      MS. WESS: Object to form.

21      A   Yes.  Unless it was received after litigation.

22  (Hanson Decl. Ex. D - Gauthreaux Dep. at 119-20.) The Bernie Williams estimate was provided

23  to Balboa long before litigation commenced. Plaintiff did not file her lawsuit until April 16,

24

25

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT RE: VIOLATIONS OF THE INSURANCE FAIR
CONDUCT ACT AND CONSUMER PROTECTION ACT — 7

NO. CV  13-00892 JCC

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW
SUITE 480
MOUNTLAKE TERRACE, WA 98043
425.582.5636

2013, which was 12 months after Balboa received the Williams estimate. There was no legitimate basis for Balboa's failure to forward the estimate to Gauthreaux.

Perryman also testified that he was never given a copy of the Williams estimate until the day of his deposition. (Hanson Decl. Ex. F - Perryman Dep. at 114.) If he had seen the Williams estimate, he would have tried to meet with Williams to evaluate their differences. (Hanson Decl. Ex. F at 131.) Perryman testified:

> Q.   Okay.  In order to have the most accurate possible estimate of the cost of repairs, would you have liked to have been shown this Aspirant estimate?
>
> A.   I would have liked to have met them out there to walk through it.
>
> Q.   What do you think would have happened if you and Mr. Williams, who wrote this estimate, had met out there and walked through it?
>
> A.   Hopefully, we would have worked toward an agreed scope and specification of repair.

(Hanson Decl. Ex. F at 131.) Balboa has not offered any explanation for why Gauthreaux and Perryman were not provided with the Williams estimate. Nor has Balboa explained why it made no effort to cooperate with Williams in order to reach an agreed scope of repairs.

After deciding not to show Gauthreaux and Perryman the Williams estimate, Balboa then retained Robert May and the law firm of Smith Freed & Eberhard P.C. to assist with the investigation and handling of the claim. On June 13, 2012, May sent a letter explaining that Collazo's claim was still under investigation and he was evaluating the coverage issues. (Dkt. No. 23-2 at 62-63.)

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT RE: VIOLATIONS OF THE INSURANCE FAIR
CONDUCT ACT AND CONSUMER PROTECTION ACT — 8

NO. CV 13-00892 JCC

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW
SUITE 480
MOUNTLAKE TERRACE, WA 98043
425.582.5636

Watkins and May spoke by phone and, on July 9, 2012, Watkins sent May a letter that formally initiated the appraisal process. (Dkt. No. 23-2 at 65.) Collazo retained Roger Howson to serve as her appraiser. (*Id*.) Balboa retained David Stewart as its appraiser. (Dkt. No. 23-2 at 70.)

On October 22, 2012, Howson and Stewart met and discussed the appraisal process. (Dkt. No. 23-2 at 76.) The appraisers set a tentative date for Stewart to physically inspect the damage with Howson and several contractors. (Dkt. No. 23-2 at 76.) Stewart was unable to agree to an umpire with Howson because Stewart was waiting for permission from Balboa's attorney, Courtney Robinson. (Dkt. No. 23-2 at 78.) On November 19, 2012, the day before the scheduled inspection, Stewart's office emailed Howson and cancelled the inspection. (Dkt. No. 23-2 at 84-85.) Howson then met with Stewart and Robinson and learned that Balboa was reconsidering whether it wanted to participate in the appraisal process. (Dkt. No. 23-2 at 78.) Balboa then stopped all communications concerning the appraisal and the claim. On March 5, 2013, which was 86 days later, Howson sent an email to Stewart and his assistant, Rick Wade, asking when the appraisal would resume. (Dkt. No. 23-2 at 84.) Balboa remained silent.

On April 16, 2013, Collazo filed this lawsuit. One year later, on May 1, 2014, the Court ordered Balboa to re-enter the appraisal process. (Dkt. No. 43 at 7-9.) On June 4, 2014, Howson and Stewart met at the loss site and agreed to appoint Jim Beecher as the umpire. (Dkt. No. 45.) On June 10, 2014, licensed contractor Konrad Koss of Koss Construction prepared a re-pricing of the Bernie Williams estimate and arrived at a cost of $327,605. (Dkt. No. 66 at 41-44.) Koss then personally inspected the damage, re-evaluated the scope of repairs, and determined that he

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT RE: VIOLATIONS OF THE INSURANCE FAIR
CONDUCT ACT AND CONSUMER PROTECTION ACT — 9

NO. CV 13-00892 JCC

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW
SUITE 480
MOUNTLAKE TERRACE, WA 98043
425.582.5636

could repair the damage for $179,802. (Dkt. No. 66 at 42.) October 6, 2014, after further work with the appraisal panel, Koss reduced his estimate to $162,233. (*Id.*) Around the same time, Stewart took the position that the damage could be repaired for $76,937. (*Id.*) Stewart argued that the water used to suppress the fire had not caused any damage to the main floor, and that the upstairs windows did not need replacement. (Dkt. No. 66 at 41-42.) Collazo and her family had already performed repairs to the damage to the main floor and the windows (*See* Dkt. No. 23 at 23-24, lines 22-17), so much of the damage was no longer visible and Balboa questioned whether the repairs had been necessary.

On November 7, 2014, the appraisal panel made its final determination. (Dkt. No. 69.) The Appraisal Award was signed by all three appraisers, with Stewart dissenting. (*Id.*) The appraisal panel awarded Collazo $150,000 for the Replacement Cost of the repairs and $96,229.86 for the Actual Cash Value of the repairs. (*Id.*) These amounts are more than three times the offers and payments made by Balboa during the insurance claim. Balboa had only offered, at most, $45,563 Replacement Cost. (Dkt. No. 23-2, at 49.)

The appraisal panel also determined that the ordinance and law "code upgrades" would "increase repair costs substantially" above the $150,000 replacement cost. (*Id.*) This determination finally puts to rest Balboa's argument that there would not be any increased costs resulting from compliance with ordinance or law. Accordingly, Balboa's denial of coverage for ordinance or law costs was wrongful.

More than four-and-a-half years have passed since the fire. Collazo and her family are still living in the fire-damaged house. (Dkt. No. 23 at 25.) None of the three bedrooms on the

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT RE: VIOLATIONS OF THE INSURANCE FAIR
CONDUCT ACT AND CONSUMER PROTECTION ACT — 10

NO. CV 13-00892 JCC

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW
SUITE 480
MOUNTLAKE TERRACE, WA 98043
425.582.5636

second floor have been fully repaired. (Dkt. No. 23 at 24, ¶ 13.) Subfloors, sheetrock, and ceilings in the first, second, and third floors still need to be replaced. (*Id.*) Collazo's main source of heat, a pellet stove, was also damaged and, as of February 7, 2014, it had not yet been repaired. (Dkt. No. 23 at 24, ¶ 14.)

The appraisal process was expensive for Collazo. She owes Howson $250 per hour for every hour that he worked on the appraisal. (Dkt. No. 23-2 at 72.) She also owes the umpire, Beecher, for half the cost of his work on the appraisal. Collazo has not yet received a final invoice from Howson or Beecher.

## IV. ARGUMENT

### A.    Standard for Summary Judgment

A party is entitled to summary judgment if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In determining whether an issue of fact exists, the Court must view the evidence and draw reasonable inferences from the evidence in the light most favorable to nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986); *United States v. Johnson Controls, Inc.*, 457 F.3d 1009, 1013 (9th Cir. 2006).   To avoid summary judgment, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The facts presented in this motion are not genuinely in dispute. Collazo is entitled to judgment as a matter of law.

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT RE: VIOLATIONS OF THE INSURANCE FAIR
CONDUCT ACT AND CONSUMER PROTECTION ACT — 11

NO. CV 13-00892 JCC

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW
SUITE 480
MOUNTLAKE TERRACE, WA 98043
425.582.5636

**B.    The Appraisal Award Has Legal Effect and It Is the Final Determination of the Amounts Owed to Collazo**

The parties are contractually and legally bound by the appraisal award. Appraisal is a well-established alternative dispute resolution mechanism that is included in all homeowner insurance contracts. Appraisal provisions facilitate "fair dealing" and "the prevention of litigation." *Keesling v. Western Fire Ins. Co.*, 10 Wn. App. 841, 846, 520 P.2d 622, 626 (1974).

**C.    Balboa Violated WAC 284-30-330(7)**

WAC 284-30-330(7) provided that it was an unfair or deceptive act or practice to do the following:

> Compelling a first party claimant to initiate or submit to litigation, arbitration, or appraisal to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in such actions or proceedings.

Balboa compelled Collazo to initiate appraisal by offering less than a third of the $150,000 RC and $96,000 ACV she was ultimately awarded. Balboa then compelled Collazo to initiate litigation by stopping the appraisal process and refusing to participate in the appraisal until the Court ordered it to do so. Balboa should be found to have violated WAC 284-30-330(7) as a matter of law.

**D.    Balboa Violated WAC 284-30-330(3), 330(14), and 360(2) when It Knowingly Refused to Respond to Dyer's Letter**

Balboa concedes that it was aware of Dyer's letter and that it refused to respond to him. Balboa explains that it did not respond because it required a signature from Collazo, but it kept this requirement a secret from Dyer.

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT RE: VIOLATIONS OF THE INSURANCE FAIR
CONDUCT ACT AND CONSUMER PROTECTION ACT -- 12

NO. CV 13-00892 JCC

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW
SUITE 480
MOUNTLAKE TERRACE, WA 98043
425.582.5636

Insurers that ignore communications from their customers are a widespread problem in the insurance industry. By ignoring Dyer, Balboa violated three separate insurance regulations. WAC 284-30-330(14) provided that it was an unfair or deceptive act or practice to do the following:

> Unfairly discriminating against claimants because they are represented by a public adjuster.

Refusing to talk to a public adjuster is precisely the kind of discrimination contemplated by WAC 284-30-330(14). Balboa should be found to have violated WAC 284-30-330(14) as a matter of law.

WAC 284-30-330(2) provided that it was an unfair or deceptive act or practice to do the following:

> Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies.

It is undisputed that Balboa refused to acknowledge Dyer's letter and did nothing to act on his reasonable requests. Balboa should be found to have violated WAC 284-30-330(2) as a matter of law.

Similarly, WAC 284-30-360(3) provided:

> For all other pertinent communications from a claimant reasonably suggesting that a response is expected, an appropriate reply must be provided within ten working days for individual insurance policies, or fifteen working days with respect to communications arising under group insurance contracts.

Dyer meets the definition of a "claimant" under the rule because he informed Balboa that he was a legal representative of Collazo. WAC 284-30-320(2) provided:

> "Claimant" means, depending upon the circumstance, either a first party claimant,

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT RE: VIOLATIONS OF THE INSURANCE FAIR
CONDUCT ACT AND CONSUMER PROTECTION ACT — 13

NO. CV 13-00892 JCC

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW
SUITE 480
MOUNTLAKE TERRACE, WA 98043
425.582.5636

a third party claimant, or both and includes a claimant's designated legal representative and a member of the claimant's immediate family designated by the claimant.

It is undisputed that Balboa failed to reply to Dyer within 10 days of receiving his letter. Balboa should be found to have violated WAC 284-30-360(3) as a matter of law.

### E.   Balboa Violated the Washington Insurance Fair Conduct Act

The IFCA provided:

> Any first party claimant to a policy of insurance who is unreasonably denied a claim for coverage or payment of benefits by an insurer may bring an action in the superior court of this state to recover the actual damages sustained[.]

RCW 48.30.015. Collazo met the definition of a "first party claimant" because she was "asserting a right to payment as a covered person under an insurance policy or insurance contract arising out of the occurrence of the contingency or loss covered by such a policy or contract." RCW 48.30.015 (4). In addition to an unreasonable[1] denials of benefits, a violation of any of the WAC insurance regulations constituted an independent violation of IFCA. RCW 48.30.015(5).[2] Accordingly, Balboa violated the IFCA if it unreasonably denied a payment of benefit **or** if it violated any of the WAC insurance regulations.

---

[1] Insurance bad faith decisional law may be instructive concerning the definition of "unreasonable" under IFCA. An insurer breaches its duty of good faith if its actions were unreasonable, frivolous, or unfounded. *Mutual of Enumclaw Ins. Co. v. Dan Paulson Const., Inc.*, 161 Wn.2d 903, 916 (2007).

[2] Further guidance on this issue is provided by Washington Pattern Instructions. They provide that an IFCA violation occurs when "That (name of insurer) [unreasonably denied a claim for coverage] [unreasonably denied payment of benefits] [or] [violated a statute or regulation governing the business of insurance claims handling]". WPI 320.06.01.

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT RE: VIOLATIONS OF THE INSURANCE FAIR
CONDUCT ACT AND CONSUMER PROTECTION ACT — 14

NO. CV 13-00892 JCC

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW
SUITE 480
MOUNTLAKE TERRACE, WA 98043
425.582.5636

It is indisputable that Balboa failed to offer Collazo payment for the full extent of the benefits available under the contract. The $150,000 appraisal award conclusively established that Balboa's $45,563 offer was insufficient and deprived Collazo of the full benefit of the contract. Further, this Court has found that Balboa wrongfully denied Collazo the benefit of the appraisal clause, wrongfully denied payment for the cost of overhead and profit, wrongfully denied payment for the cost of complying with ordinance or law, and wrongfully reduced its payment based a false deductible. Each of these denials of benefits was "unreasonable" under IFCA.

Balboa has not offered a reasonable explanation for its blatantly insufficient payment to Collazo. When Collazo sought professional help, Balboa refused to communicate with her public adjuster and prevented him from negotiating an agreed scope and cost of repairs. This was unreasonable and, as discussed above, violated the WAC insurance regulations. When Collazo then turned to an attorney and provided a detailed estimate, Balboa refused to communicate with her contractor. This was also unreasonable. After receiving the Williams estimate, Grizzle stated that Balboa had forwarded that estimate to its adjusters. But Gauthreaux and Perryman both testified that this was not true. If they had seen it, they would have collaborated with Williams to reach an agreed scope and cost of repairs. Balboa prevented this resolution from occurring.

After Balboa refused to work with Dyer or Williams, appraisal was the only remaining contractual option for Collazo. As discussed above, Balboa violated of WAC 284-30-330(7) when it made appraisal inevitable.

While Balboa initially participated in the appraisal process, it withdrew when it became apparent to Balboa that the appraisal process would prove that Balboa had underpaid the claim.

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT RE: VIOLATIONS OF THE INSURANCE FAIR
CONDUCT ACT AND CONSUMER PROTECTION ACT — 15

NO. CV 13-00892 JCC

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW
SUITE 480
MOUNTLAKE TERRACE, WA 98043
425.582.5636

If Balboa had truly believed its estimate was accurate, it would have participated in the appraisal process so that the claim would be resolved. Appraisers are uniquely situated to arrive at a fair award. Appraisers can visit the property in person to accurately resolve disagreements concerning the scope of the damage. Moreover, appraisers typically have expertise in the fields of insurance and/or construction, which reduces their reliance on expert witnesses. But Balboa decided a fair resolution was not in its interest. Balboa's refusal to participate in the appraisal dispute resolution process was an unreasonable denial of a benefit of the insurance contract.

By refusing to participate in the appraisal process, Balboa left Collazo no choice but to file this lawsuit. This was another violation of WAC 284-30-330(7).

These facts show that Balboa unreasonably denied multiple benefits to Collazo. Balboa also violated multiple WAC insurance regulations. Accordingly, Balboa should be found to have violated the IFCA as a matter of law.

F.    **Balboa Violated the Consumer Protection Act**

Each time that Balboa violated the WAC regulations, it also violated the CPA. A single violation of the WAC insurance regulations is an unfair or deceptive act or practice under the CPA. *Anderson v. State Farm Mut. Ins. Co.*, 101 Wn. App. 323, 331, 2 P.3d 1029 (2000) citing *Industrial Indem. Co. v. Kallevig*, 114 Wn.2d 907, 924, 792 P.2d 520 (1990).[3] In general, to prevail in a private CPA action, the plaintiff must show that the defendant's conduct met the elements of the *Hangman Ridge* five-part test: (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) impacting the public interest, (4) injuring plaintiff in his or

---

[3] Similarly, an insurer's breach of the duty of good faith constitutes a *per se* violation of the CPA. *Salois v. Mut. of Omaha Ins. Co.*, 90 Wn.2d 355, 359, 581 P.2d 1349 (1978).

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT RE: VIOLATIONS OF THE INSURANCE FAIR
CONDUCT ACT AND CONSUMER PROTECTION ACT — 16

NO. CV 13-00892 JCC

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW
SUITE 480
MOUNTLAKE TERRACE, WA 98043
425.582.5636

her business or property, and (5) causation. *Hangman Ridge v. Safeco Title*, 105 Wn.2d 778, 780, 719 P.2d 531 (1986). The first element is met when an insurer breaches its duty of good faith or violates the WAC. The second and third elements are automatically met in the context of insurance because it is a business which affects the public interest. *See* RCW 48.01.030; *see also Anderson*, 101 Wn. App. at 330. Therefore, in Washington, to prove an insurer violated the CPA, the plaintiff must show that the insurer violated a WAC regulation and prove that the plaintiff's business or property was injured as a consequence.

Here, the evidence shows that Balboa violated WAC 284-30-330(2), 330(14), and 360(3) by refusing to communicate with Collazo's public adjuster. Balboa also violated WAC 284-30-330(7) by offering substantially less than what Collazo was able to obtain through litigation and appraisal. Collazo was harmed by each of Balboa's violations because they delayed the resolution of her insurance claim, delayed the repair of her property, and forced her to hire attorneys and an appraiser to resolve the claim. Balboa should be found to have violated the CPA as a matter of law.

## V. CONCLUSION

Summary judgment is appropriate here because the central facts are not in dispute. It has been established that Balboa grossly underpaid the claim, refused to respond to Collazo's public adjuster, and failed to work with Collazo's contractor to reach an agreed scope of repairs. It has also been established that Balboa unreasonably denied multiple benefits of the insurance contract. Balboa has not yet shown Plaintiff any evidence to suggest that Balboa's actions were well-founded and had reasonable justifications. If Balboa does not submit

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT RE: VIOLATIONS OF THE INSURANCE FAIR
CONDUCT ACT AND CONSUMER PROTECTION ACT — 17

NO. CV 13-00892 JCC

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW
SUITE 480
MOUNTLAKE TERRACE, WA 98043
425.582.5636

evidence showing it had reasonable justifications for its conduct, then summary judgment is appropriate.

Collazo respectfully requests that the Court find that Balboa violated the IFCA due to its unreasonable denial of insurance benefits and/or its violation of the WAC insurance regulations. Collazo also requests that the Court find that Balboa violated one or more of insurance regulations WAC 284-30-330(2), 330(7), 330(14), or 360(2), in order to assist the jurors in their evaluation of Collazo's bad faith, IFCA, and CPA claims. Lastly, Collazo requests that the Court find that Balboa violated the CPA when it violated the WAC regulations.

DATED this 19th day of November, 2014.

JOEL B. HANSON, ATTORNEY AT LAW, PLLC

/s Joel Hanson
Joel B. Hanson, WSBA #40814
Attorney for Plaintiff

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT RE: VIOLATIONS OF THE INSURANCE FAIR
CONDUCT ACT AND CONSUMER PROTECTION ACT — 18

NO. CV 13-00892 JCC

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW
SUITE 480
MOUNTLAKE TERRACE, WA 98043
425.582.5636

1

2

3

4

5

6

7

8

9

10

11

12

13

14

The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT WESTERN DISTRICT OF
WASHINGTON AT SEATTLE

| ELSIE G. COLLAZO,<br><br>Plaintiff,<br><br>v.<br><br>BALBOA INSURANCE COMPANY, an<br>insurance company,<br><br>Defendant. | NO. CV 13-00892 JCC<br><br>**DECLARATION OF JOEL B. HANSON IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT RE: VIOLATIONS OF THE INSURANCE FAIR CONDUCT ACT AND CONSUMER PROTECTION ACT** |
|---|---|

15

16

17

18

19

20

21

22

23

24

25

I, Joel Hanson, declare as follows:

1.      I am over 18 years of age and otherwise competent to make this Declaration, which is based on my personal knowledge and the documents enclosed herein.

2.      I am one of the attorneys who represents the plaintiff in this matter.

3.      Attached as Exhibit A is a true and correct copy of Bud Dyer's November 26, 2011 letter. This page is bates stamped as BAL 121.

4.      Attached as Exhibit B is a true and correct copy of a selected page from Balboa's claim file. The page is labeled BAL 053.

DECLARATION OF JOEL B. HANSON — 1

NO. CV 13-00892 JCC

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW
SUITE 480
MOUNTLAKE TERRACE, WA 98043
206.412.8765

5.      Attached as Exhibit C is a true and correct copy of a selected page from Balboa's claim file. The page is labeled BAL 268.

6.      I have reviewed Balboa's claim file and I saw no evidence that Balboa ever responded to Bud Dyer's letter of representation or communicated with him in any way.

7.      Attached as Exhibit D is a true and correct copy of selected pages from the Deposition Transcript of Glenn Gauthreaux. Those pages are 116-20.

8.      Attached as Exhibit E is a true and correct copy of Gary Williams' report.

9.      Attached as Exhibit F is a true and correct copy of the selected pages from the Deposition Transcript of Dean Perryman. Those pages are 114 and 131.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Signed at Mountlake Terrace Washington, this ___19th___ day of November, 2014.

Joel Hanson

DECLARATION OF JOEL B. HANSON — 2

NO. CV 13-00892 JCC

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW
SUITE 480
MOUNTLAKE TERRACE, WA 98043
206.412.8765

# EXHIBIT A

# Cascade Public Adjusters

35113 176ᵗʰ AVE. SE
AUBURN, WA. 98092
OFFICE (253) 833-7752          FAX (253) 833-3370

*"Providing Peace of Mind"*

November 26, 2011

BALBOA Insurance Group
C/O Bank of America Insurance Services
Attention: Homeowner Claims
PO BOX 19702
Irvine, CA 92623

L/C023507

Re:   Insured:              Elise Collazo
      Claim Number:         30-6394
      Policy Number:        Unknown
      Date of Loss:         May 21, 2010
      Cause of Loss:        Fire
      Location of Loss:     3318 North 27th Street
                            Tacoma, WA 98407
      Writing Company:      BALBOA Insurance Group

Dear Claims Department;

As you are aware, the above named insured has suffered a serious property loss at the property noted above. She has now retained Cascade Public Adjusters to represent solely her financial interest in the claim process. The insured extends to you the following instructions:

1.    Direct all further communications and correspondence to Cascade Public Adjusters at the above address and phone.
2.    Please immediately provide a certified copy of the insurance policy to include the declarations and all endorsements applicable.
3.    Show Cascade Public Adjusters, as a partial assignee on any and all payments made in relation to this claim.
4.    Please provide copies of any of your correspondence, repair specifications and payments made to date.

Your insured intends to make a claim for the replacement cost value of above noted loss as defined under the terms of her contract with Balboa Insurance Group.

Sincerely;
Cascade Public Adjusters

Bud Dyer L.P.I.A.

Cc:   Cascade claim file
      Ms. Elise Collazo
      Law Offices of Michael T. Watkins

Encl.:   Signed Retainer Notice

BAL 121

# EXHIBIT B

was completed by Gauthreaux. Glenn on 01/12/2012 11:50:50.

CREATED DATE: 01/12/2012 11:50:43, CREATED BY: Gauthreaux, Glenn, Activity Type Follow-Up on L10023507 for Elijah Kellum has approved payment for the amount of $282.27 on 01/11/2012 16:47:48 was completed by Gauthreaux, Glenn on 01/12/2012 11:50:43.

CREATED DATE: 01/11/2012 14:48:35, CREATED BY: WRQ, WRQ, IA Expense payment submitted in the amount of $282.27 to Idavada Claims Inc for 30-6394-3/Fire by Vyles, Vanessa on 01/11/2012 14:47:48.

CREATED DATE: 01/11/2012 14:47:48, CREATED BY: Kellum, Elijah, Elijah Kellum has approved payment for the amount of $282.27 on 01/11/2012 16:47:48

CREATED DATE: 01/11/2012 14:47:48, CREATED BY: Kellum, Elijah, Activity Type Approval Action on L10023507 for Requested payment amount of $282.27 exceeds 'Expense Authority Limit'. was completed by Kellum, Elijah on 01/11/2012 14:47:48.

CREATED DATE: 01/11/2012 12:16:00, CREATED BY: Gauthreaux, Glenn, invoice in line for pament...de to additonal work needed for file...

CREATED DATE: 01/11/2012 12:07:37, CREATED BY: Vyles, Vanessa, Paid Idavada 30-6394-3 for 282.27

CREATED DATE: 01/11/2012 12:07:20, CREATED BY: Vyles. Vanessa, Expense payment request pending approval by Elijah Kellum for $ 282.27 submitted by Vanessa Vyles on 01/11/2012 14:07:20

CREATED DATE: 01/11/2012 12:06:50, CREATED BY: Vyles, Vanessa, Vanessa Vyles set the Claim

CREATED DATE: 01/11/2012 12:06:50. CREATED BY: Vyles, Vanessa. Vanessa Vyles set the Claim Outcome field to Pay with Indemnity on 01/11/2012 14:06:50.

CREATED DATE: 01/11/2012 12:00:08, CREATED BY: Vyles, Vanessa, Per CA, invoice is legit. Extra work on file was needed since borrower was getting an attorney - IA was following up to confirm. Paying invoice per CA.

CREATED DATE: 01/09/2012 08:15:23, CREATED BY: Vyles. Vanessa, CA has been having computer issues. Will follow-up later.

CREATED DATE: 01/03/2012 09:22:19, CREATED BY: Vyles, Vanessa, INVOICE: We have received an invoice from Idavada - #30-6394-3 for $282.27. We have already paid an inspection fee plus a flat fee reinspect on this claim. This looks like T&E charges. Have emailed CA to please review and advise if it needs to be disputed or paid.

CREATED DATE: 12/30/2011 08:41:46, CREATED BY: ROBOT, INTEGRATION, Document received via Mail : Invoices, Document Id: 090163df927388c0

CREATED DATE: 12/02/2011 08:32:06, CREATED BY: Vyles. Vanessa, Activity Type Inbound Document on L10023507 for Document received via Mail : Correspondence, Document Id: 090163df922c77a2 was completed by Gauthreaux, Glenn on 12/02/2011 08:32:06.



CREATED DATE: 12/02/2011 08:31:12, CREATED BY: Vyles, Vanessa, Rcvd correspondence with req from PA. However, the LOR is unsigned. We cannot do anything with an unverified LOR.

BAL 053

# EXHIBIT C

Pertinent Communications, Failure to adhere to Standards for Prompt Investigation of Claims as well as Prompt, Fair And Equitable Settlement procedures, and unreasonable denial of a claim for coverage or payment of benefits.



CREATED DATE: 06/12/2012 10:02:11, CREATED BY: Konicke, Melinda, UL File Review: L10023507: . The claim file was opened on 05/28/2010 and assigned to a rep as well as an IA on 06/01/2010 who sent a contact letter as our borrower was not reached via telephone. Rep spoke to borrower to confirm FOL on 06/08/2012 but did not take a RS. Her grandson lit a match causing a fire to start in the master bedroom and cause smoke damage thoughout the home. This is an FOH/LPH risk with LPP effective dates of 11/09/2009 – 11/09/2010 and limits of $277,067.00. As this was a Victorian home it was noted initially that a supplement might be expected. An initial ACV payment of $30,920.37 was made payable to the lender. . Breakdown: . $38,960.29 RC/tax/O&P ($5,919.48) Less O&P ($690.84) Less nonrecoverable depreciation ($429.60) Less recoverable depreciation ($1,000.00) Less deductible $30,920.37 ACV payment . The final indemnity payment was processed on 07/01/2010 in the amount of $30,920.37 to Financial Freedom Acquisition LLC, for the acct of Elsie Collazo. . On 08/26/2010, we rcvd a VM from the borrower and spoke to the borrower on 08/30/2010 confirming that a re-inspection was needed. We eventually rcvd a supplemental estimate from the IA on 09/28/2010 and made payment for the hidden damages behind the walls and additional HVAC damage in the amount of $5,985.54 on 09/30/2010. Then on 01/21/2011, we rcvd a call from the lender indicating they rcvd a bid from the borrower for $80k. We resent the IA and still didn't have an update as of 01/27/2011. Then on 02/03/2011 we followed up with the IA again for re-inspection information. And again on 02/10/2011 we gave him borrowers ctc info and address for re-inspection. Then we didn't follow up again until 03/02/2011 even though we were processing invoices, etc in the file per the notes. At that time we were advised there was no reason for a supplement per the IA and sent a closing letter as well as advising borrower via VM of this decision.  On 12/02/2011, we rcvd a letter indicating borrower had hired a PA but we did nothing on because it didn't have a signature on the retention page. Then we rcvd a LOR and request for a certified copy of our policy on 04/10/2012 and there was a request for same by rep on 04/17/2012 per the notes. However, there is no indication as to whether this was completed in the notes or in the documents section. Then we rcvd another letter from the borrower atty indicating a 20 day notice for violations of the insurance fair conduct act and a copy of a $348k+ estimate for damages to the home.

CREATED DATE: 05/30/2012 15:30:59, CREATED BY: Konicke, Melinda, IA EXPENSE: . An IA was inadvertently assigned on this matter as it was not marked ECT by FNOL. There is a flat cancellation fee of $50.00 on these per contract with vendor. Drafting payment for $50.00 for

# EXHIBIT D

1                    UNITED STATES DISTRICT COURT

2            WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3

4

5
ELISE G. COLLAZO,                *
6                                *
        Plaintiff,               *
7                                *      NO. CV13-00829 JCC
VERSUS                           *
8                                *
BALBOA INSURANCE COMPANY,        *
9                                *
        Defendant.               *
10                               *
    * * * * * * * * * * * * * * * * * * * * * * * * * *
11

12

13

14

15            Deposition of GLENN GAUTHREAUX, taken at

16   Ridgelake Office Suites, 3350 Ridgelake Drive, Suite

17   200, Metairie, Louisiana 70002, on Thursday, June 19th,

18   2014, beginning at 11:30 a.m.

19

20

21   By:   Ashlee B. Ancalade

22   Registered Professional Reporter

23   ATKINSON-BAKER, INC.
     COURT REPORTERS
24   (800) 288-3376
     www.depo.com
25   FILE NO.: A8070E0

                                                                    1

```
 1        Q    Okay.  So can you jump ahead to Exhibit
 2   No. 31, please?
 3        A    Did you say 31?
 4        Q    Yeah.
 5        A    (Views document.)  Okay.
 6        Q    Go to the second-to-last page where it says
 7   BAL268.
 8        A    I think I have it.  The numbers are cut off,
 9   though.
10        Q    Yeah.  Do you see this large section of text
11   by Melinda Konicke?
12        A    I do.
13        Q    Do you know who that is?
14        A    No.
15        Q    Have you ever spoken with her?
16        A    No.
17        Q    Do you see towards the sort of I guess lower
18   half part of this large paragraph?
19        A    Okay.
20        Q    And it says -- if you go to -- it says, "On
21   12/2/11, we received a letter indicating borrower had
22   hired a PA."
23             Do you see that?
24        A    I do.
25        Q    Then it says, "But we did nothing because it
```

1  didn't have a signature on the retention page."

2          Do you see that?

3      A    I do.

4      Q    Do you remember that issue coming up where

5  you received -- before I ask.  Where it says "PA," that

6  refers to public adjustor.  Correct?

7      A    Correct.

8      Q    And so that would be Mr. Dyer, a public

9  adjustor.  Correct?

10     A    Correct.

11     Q    Because he's part of -- his letter,

12 Exhibit 24, says Cascade Public Adjustors?

13         Do you see that?

14     A    Correct.

15     Q    So do you recall that now, rejecting his

16 letter because it did not have a signed -- let's see, a

17 signed retention page?

18     A    No.

19     Q    Would you normally reject a letter from a

20 public adjustor because it didn't have a signed

21 retention page?

22     A    No.  I would make a call.

23     Q    You would make a call to the public adjustor?

24     A    Yes.

25     Q    And you would ask for a signed retention page

1  if you needed one?

2       A    Correct.

3       Q    Do you normally need a retention page?

4       A    Yes.

5       Q    Have you ever worked with a public adjustor

6  without a retention page?

7       A    Possibly.

8       Q    Is it possible that you rejected Mr. Dyer's

9  letter and just don't remember it?

10      A    No.

11      Q    If Balboa received this letter from Mr. Dyer,

12 should it have gone to you?

13      A    Yes.

14      Q    Is there somebody else that was handling the

15 claim for Balboa that this letter could have gone to

16 instead of you?

17      A    The letter -- I'm sorry.  The file gets

18 transferred to the legal department once we are

19 notified of litigation.

20      Q    What about a public adjustor?

21      A    No.  Not a public adjustor.

22      Q    Okay.  Do you know if there was any

23 litigation at the time of this letter from Mr. Dyer?

24      A    Not that I was aware of.

25      Q    Okay.  Let's go on to Exhibit No. 27, please.

1        A      (Views document.)  Okay.

2        Q      Have you ever seen this estimate before?

3        A      No.

4        Q      See where it says "Aspirant Consulting

5   Group"?

6        A      Yes.

7        Q      And do you see where it says Bernie Williams

8   as the estimator?

9        A      Yes.

10        Q      And do you see where it says that the client

11   is Grace Collazo?

12        A      Yes.

13        Q      Is this -- today the first time you've seen

14   this estimate?

15        A      Yes.

16        Q      Can you go to page 63 of this estimate?

17        A      (Views document.)  Okay.

18        Q      Do you see where it says that the total cost

19   of repairs is $348,000?

20        A      Yes.

21        Q      If you had seen this estimate, would you have

22   asked Mr. Perryman to go back to the loss site and try

23   and reconcile the differences with Mr. Williams?

24            MS. WESS:

25                  Object to form.

```
 1      A    Yes.

 2   BY MR. HANSON:

 3      Q    But you never saw this estimate.  Correct?

 4      A    Correct.

 5      Q    And that would be standard procedure, for you

 6   to have him go back to the loss site and meet with

 7   Mr. Williams.  Correct?

 8           MS. WESS:

 9                Object to form.

10      A    Correct.

11   BY MR. HANSON:

12      Q    And that would be so they could attempt to

13   reach an agreement on the scope and cost of repairs?

14      A    Correct.

15      Q    If Balboa received a copy of this estimate,

16   should it have gone to you?

17           MS. WESS:

18                Object to form.

19      A    Yes.  Unless it was received after

20   litigation.

21   BY MR. HANSON:

22      Q    Can you look at Exhibit No. 26?

23      A    (Views document.)  Okay.

24           Hello?

25                (Phone call was disconnected.)
```

1               C E R T I F I C A T E

2               This certification is valid only for a
    transcript accompanied by my original signature and
3   original required seal on this certificate.

4

5               I, Ashlee Ancalade, Certified Court Reporter
    in and for the State of Louisiana, as the officer
6   before whom this testimony was taken, do hereby certify
    that GLENN GAUTHREAUX, after having been duly sworn by
7   me upon authority of R.S. 37:2554, did testify on the
    19th day of June, 2014, in Metairie, Louisiana, as
8   hereinbefore set forth in the 144 foregoing pages; that
    this testimony was reported by me in the stenotype
9   reporting method, was prepared and transcribed by me or
    under my personal direction and supervision, and is a
10  true and correct transcript to the best of my ability
    and understanding; that the transcript has been
11  prepared in compliance with transcript format
    guidelines required by statute or by rules of the
12  board, that I have acted in compliance with the
    prohibition on contractual relationships, as defined by
13  Louisiana Code of Civil Procedure Article 1434 and in
    rules of the board; that I am not related to counsel or
14  to the parties herein, nor am I otherwise interested in
    the outcome of this matter.

15

16              SUBSCRIBED AND SWORN on the 19th day of June,

17  2014.

18

19

20

21             _____

22                    ASHLEE ANCALADE, CCR #21019

23

24

25

# EXHIBIT E

GARY WILLIAMS

252 Blueberry Hill Drive - Quilcene, Washington 98376

(360)765-0729 - gw@areyoucovered.com

# COLLAZO v. BALBOA INSURANCE COMPANY

### Western District of Washington, No. 2:13-cv-00892 - JCC

## Report of Gary Williams

### I. Qualifications

I have qualified as a claim handling expert and have testified in both state and Federal courts in Washington. My qualifications include:

1. Claims adjuster/supervisor from 1968 through 1975, for Safeco, American States. Independent insurance adjuster from 1975 to 1981.

2. Insurance law practice since 1979, both as defense and policyholder's counsel.

3. Designed and taught a program in insurance adjusting at Pierce College.

4. Lecture at continuing legal education seminars on insurance law, claim handling and litigation.

5. Published both locally and nationally on claim handling, appraisal, and related insurance claim subjects.

Please see Exhibit A, my attached curriculum vitae for more detail.

### II. Assignment

Counsel asked me to review the claim file and related documents and provide any opinions on whether Balboa Insurance Company (hereinafter "Balboa") adjusted this first party property claim within the standards and practices for claim handling in Washington.

August 27, 2014
Collazo v. Balboa Insurance Company
Report of Gary Williams-1

## III. Materials Reviewed and Data Considered

To review Balboa's handling of the claim, I considered the insurance company's claim files, the independent adjuster's file, appraisers' files, a file from Financial Freedom, the insurance policy, documents and depositions obtained in discovery, and the Washington Unfair Claims Settlement Practices Regulations. I interviewed Roger Howson, Joel Hanson, and Bud Dyer. I also relied upon my forty five years of experience as an insurance adjuster, teacher and lawyer. I am very familiar with Washington's standards of care and practice in the adjustment of insurance claims. My assignment here is not to form or apply legal conclusions to the facts of the adjustment, but to discuss standards of care and conduct in the insurance claim industry, and to consider whether those standards were met by Balboa in this claim.

## IV. Standards of Good Faith Claim Handling

Washington has clear standards of good faith claim handling. Claim professionals know these standards and know they are required to meet them. The statutory and regulatory based standards were described in a recent opinion from the Supreme Court of Washington:

> Washington's insurance bad faith law derives from statutory and regulatory provisions, and the common law. The insurance code begins with recognition that "[t]he business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception, and practice honesty and equity in all insurance matters." RCW 48.01.030. The insurance code permits the insurance commissioner to promulgate administrative regulations governing the claims-handling process. RCW 48.30.010. To this end, the commissioner has adopted chapter 284-30 WAC. A violation of the insurance code or a regulation promulgated thereunder constitutes an unfair practice under the CPA. See RCW 48.30.010. This court long ago recognized that a single violation of a claims handling regulation may violate the CPA. *Industrial Indemnity Co. v. Kallevig*, 114 Wn.2d 907, 921, 792 P.2d 520 (1990).

August 27, 2014
Collazo v. Balboa Insurance Company
Report of Gary Williams-2

*St. Paul Fire & Marine Ins. Co. v. Onvia, Inc*, 165 Wn.2d 122, 196 P.3d 664 (2008). The claims handling regulations are clear, mandatory guidelines for insurers to follow, particularly in first party claims. These principles are neither complex nor highly technical. The essence of good faith claim service is to remember always that the claims professional's job is to help, not hurt the damaged insured. A first party claim should not be an adversarial proceeding. The money which pays for an insurer's investigation and adjustment comes from premium dollars. Premium dollars come from policyholders, so the insurer's investigation and adjustment should benefit the policyholder who paid for it.

Equal consideration is a key standard. Insurers have fiduciary or quasi-fiduciary duties to their customers, which has motivated courts to find standards within fiduciary models. One such standard is that the insurer must give at least equal consideration in all matters to the policyholder. This standard, more than any other, defines the insurer-insured relationship.

The standards of care and practice in claim handling don't vary much across the country. Industry standards are nationwide and apply regardless of fair claims acts or regulations, which do vary from state to state. Our Unfair Claims Practices Regulations (usually called "the WACs") are a set of minimum standards promulgated by our Insurance Commissioner. They are taken from a national set of standards developed by the National Association of Insurance Commissioners. The WACs describe many of the industry standards for good faith claim handling, but not all of them.

Some of these principles are not generally known or appreciated by the general public, who often believe an adjuster's job is to pay as little as possible. To the contrary, an adjuster's job is to pay what is owed according to the policy, no more and no less, and to do it as soon as possible. Insurance claim adjusting is a service profession.

## V. Violations of Standards of Good Faith Claim Handling

### A. Factual Summary.

5/21/10    Fire damaged an older home owned by Elsie Collazo. She had taken a reverse mortgage to Financial Freedom, a Division of OneWest Bank, FSB, which had lender placed insurance on the

home because Ms. Collazo had no homeowners policy. The insurer was Balboa Insurance Company.

The policy covered fire damage to the home, but did not include coverage for contents, living expenses, or liability. It carried a policy limit of $277,000 and a $250 deductible. The policy covered both Financial Freedom and Ms. Collazo, and required that both fulfil various duties and requirements. The premium was $2,424.

6/01/10    When Balboa received notice of the claim, it hired Dean Perryman, Paragon Claims, a local independent adjuster. Balboa made a limited assignment, retaining Perryman to estimate the amount of loss for a flat fee.

6/16/10    Mr. Perryman wrote a $39,162 estimate to repair the damage.

6/30/10    Balboa set a reserve of $60,000.

Balboa deducted $1,000 for the deductible and $5,919 for contractor's   overhead and profit, saying it will pay the overhead and profit only if a general contractor does the repairs. Perryman had not recommended that deduction. Net payment was $30,920.

Nothing in the policy suggests that the insurer will not pay contractor's overhead and profit, regardless of what repairs are made or by whom. Deducting overhead and profit unless the insured hires a general contractor is not an accepted local practice.  Balboa unreasonably refused to pay overhead and profit.

It is unclear why Balboa uses a $1,000 deductible. The policy appears to have a $250 deductible. Perhaps something is missing from our copy of the policy. It is very unusual for an insurer to overcharge for a deductible, and certainly unreasonable. Perhaps there exists a change endorsement increasing the deductible, but I didn't see one.

7/01/10    Balboa set reserve at $57,500.

9/22/10       Perryman revised his estimate to $45,563 after Collazo
              complained about missed items. Balboa then makes the same
              deductions, again, arriving at a net of $30,920 plus $5,985
              totaling $36,905. Balboa did not cite a policy provision which
              allowed it to avoid paying overhead and profit, or allowed it to
              increase the deductible to $1,000.

11/26/11      Cascade Public Adjusters, Bud Dyer, sent letter of representation.
              Mr. Dyer is a licensed public adjuster who is authorized by statute
              to represent the financial interests of an insured in a property
              loss claim. It does not appear from the claim file that Balboa
              responded, or communicated at all with Dyer.

12/02/11      Balboa's activity log says: "Rcvd correspondence with req from
              PA. However, the LOR is unsigned. We cannot do anything with
              an unverified LOR." (LOR means "letter of representation").

              In fact, insurers in this area do not typically require a PA's letter
              to be verified by the insured. The claim file does not explain why
              verification was necessary here.

              It appears from the claim file and from my interview with Mr.
              Dyer, that Balboa did not tell Dyer it would not deal with him, or
              ask him to sign anything, or suggest that Balboa would not
              respond to him for any particular reason.

              Reasonable claim handling includes open and honest
              communication with insureds and/or their representatives.
              Balboa should have communicated with Mr. Dyer.

2/11/12       Roger Howson begins to prepare for a policy appraisal. Dyer says
              appraisal was the only option available to the insured at this
              point, because Balboa refused to deal with him or the claim.

3/03/11       Balboa closes the claim.

3/10/12       Aspirant, Bernie Williams, writes $348,605 estimate to repair fire
              damage.

August 27, 2014
Collazo v. Balboa Insurance Company
Report of Gary Williams-5

4/03/12    Michael Watkins represents Collazo, was retained earlier. Sends
           representation letter to Balboa.

4/25/12    Watkins sends Balboa an IFCA notice. Balboa has 20 days to cure
           per the IFCA statute, which Watkins points out to Balboa.

5/24/12    Balboa responds to the IFCA notice. Ten days late.

6/13/12    Robert May appears for Balboa, by letter. May says Balboa can
           neither accept or reject coverage at this time. It is not clear why a
           coverage issue has arisen at this time. It has been more than two
           years since the fire, which seems late to contest coverage.

7/09/12    Watkins formally demands policy appraisal. Policy gives Balboa
           20 days to appoint its appraiser.

8/13/12    Balboa, through counsel Courtney Robinson, of May's office,
           enters appraisal, appoints David Stewart. Two weeks late.

           Between 8/13/12 and 11/27/12, Howson and Stewart work on
           the appraisal. They agree on James Beecher for umpire, but
           Stewart wants approval on that from Balboa. The appraisal clause
           directs the appraisers, not the parties to choose an umpire.

           Stewart doesn't hear back from Balboa or its attorneys.

8/16/12    Stewart visits site. Takes exterior photos.

10/22/12   Stewart waits for approval from Balboa's attorneys to do a site
           visit with Howson, Scott Ograin and umpire Beecher. Unknown
           why Stewart needs permission from Balboa to do his job.

11/27/12   Mr. Howson does not understand why Balboa is stalling the
           appraisal. He contacts Balboa's lawyer, Ms. Robinson, who tells
           Howson that Balboa withdrew from the appraisal because Ms.

August 27, 2014
Collazo v. Balboa Insurance Company
Report of Gary Williams-6

Collazo had no right to demand appraisal in the first place. She
provides no explanation how Balboa could participate in
appraisal for 3 months and then quit. Balboa provided no prior
notice of withdrawal, even to Balboa's own appraiser.

4/06/13    Collazo files suit in King County Superior Court.

5/21/13    Case removed to Western District of WA.

5/01/14    Court orders Balboa to participate in appraisal. As of today, the
appraisal is unresolved and ongoing. Although Balboa produced a
claim file, it contains nothing about the ongoing appraisal.

## B. Violations of Standards

The Unfair Claim Settlement Practices Regulations, WAC 284-30-300, et

seq, are minimum standards for claim handling promulgated by the
Washington Insurance Commissioner's Office, based on common law
standards of care and practice which grew up over the last 100 years in the
insurance industry.

These regulations are known in detail by claims adjusters in
Washington. Adjusters have them available at all times, and refer to them
often. They describe standards of care and practice in the handling of claims.

1. WAC 284-30-330(4), which prohibits insurers from refusing to pay
claims without conducting a reasonable investigation, is an outgrowth of the
principle that the insurer should carefully investigate the claim, in a balanced,
objective fashion. The insurer must treat the insured's interest at least equal
to its own. Here, Balboa failed to do that by refusing to investigate and refusing
to consider the full cost of repairs to the Collazo building. The damage was
there to be discovered, but Balboa refused to see it.

It is easier for an estimator to overlook damage than to find it. Because
only a balanced investigation is reasonable, insurers must look as hard for
reasons to pay as they look for reasons to minimize claims. Here, Balboa failed
to reasonably  investigate the loss, then refused to pay the majority of this

claim as a result.

2. WAC 284-30-330 (1) forbids '[M]isrepresenting pertinent facts or insurance policy provisions." If Balboa wrongly applied the deductible, it misrepresented policy provisions, when it stated the deductible was $1,000 instead of $250.

Balboa also misrepresented the policy when it withheld overhead and profit from its actual cash value claim payment, and told Collazo she could only collect overhead and profit if she hired a general contractor to repair the house. The policy contains no such provision.

These misrepresentations are harmful and important. Many insureds are quite willing to take the carrier at its word, without digging deeply into the policy or the facts surrounding the claim. After all, who knows best what the policy covers and what it limits? Insureds should not be required to hire public adjusters, appraisers or attorneys to check the carrier's work.

3. WAC 284-30-330(2) forbids [F]ailing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies. Despite this clear directive, Balboa ignored communications from Collazo's public adjuster, Bud Dyer.

This regulation grew from the clear, universal need for prompt and meaningful communication between insurer and insured during a claim. See, e.g., WAC 284-30-360(3), which requires an answer within ten working days to a pertinent communication. By refusing to communicate with Mr. Dyer, Balboa virtually guaranteed that an appraisal would be necessary to resolve the claim.

Also, Balboa failed to move forward with the appraisal, despite the appraisal clause in the policy which required Balboa to appoint an appraiser within 20 days of notice.

4. WAC 284-30-330(7) prohibits insurers from compelling a first party claimant to initiate or submit to litigation, arbitration, or appraisal to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in such actions or proceedings. This regulation is based on the principle that insurers should:

a. Avoid delay – investigate and pay claims as soon as reasonably possible;

b. Avoid expense to the insured. Claim expense dilutes the insured's recovery. Although appraisal is often touted as a cheap, quick way to resolve property claims, it is often neither cheap nor quick. Here, for example, appraisal began more than two years ago and is not yet completed;

c. Avoid underpayment of claims, because doing so may compel insureds to demand appraisal.

Balboa failed. The loss occurred more than four years ago. The appraisal on the building is not completed. There was no valid reason for the delay. The appraisal will be expensive. If Balboa had conducted a reasonable investigation into the amount of this loss, no appraisal would be necessary. This claim should have been fully paid within four months after the loss.

Collazo was forced to hire a public adjuster and an appraiser, because Balboa did not reasonably investigate and resolve the claim.

5. WAC 284-30-370 describes standards for prompt investigation of claims. The insurer must complete its investigation within thirty days after notification of claim, unless the investigation cannot reasonably be completed within that time. This regulation reflects the industry wide standard for prompt claim service, and puts clear time limits in place. Balboa failed to conduct a prompt investigation of this claim. The claim was reported to Balboa on June 1, 2010. As of the date of this report, the claim is unresolved and in appraisal.

6. WAC 284-30-340 requires insurers to keep claim files which contain all notes and work papers pertaining to the claim in enough detail that pertinent events and dates of the events can be reconstructed. Balboa failed to do that here, because its claim file does not cover the appraisal, or much of anything after Watkins sent his 20 day IFCA notice letter.

Regardless of what else was happening, Balboa had a continuing duty to handle the open claim for fire damage to the Collazo home. The appraisal is a part of handling the claim, so appraisal progress should be documented in the file. Balboa should have kept and produced a complete claim file, but did not do so.

An unknown number of emails were apparently destroyed by Balboa, which should have been in the produced claim file. Balboa claims this was accidental, that it occurred during a corporate changeover. According to Tim Burke, current QBE electronic evidence specialist, this occurred when Balboa claim representatives neglected to save emails to local hard drives. The Bank of America server, where the emails were stored, automatically deleted emails older than 90 days. Insurance companies must keep and maintain accurate, complete claim files. If Balboa's explanation here is factually correct, Balboa was incompetent in its claim processes.

7. WAC 284-30-330(5) addresses [F]ailing to affirm or deny coverage of claims within a reasonable time after fully completed proof of loss documentation has been submitted. This regulation reflects industry standards which address promptness and the need for claim resolution. Balboa's refusal to go forward with the appraisal occurred long after any reasonable time to do so. In addition, Balboa took the coverage position that it could neither affirm or deny coverage at all in a June 13, 2012 letter.

8. Balboa interfered with the appraisal. Although we have no claim file relative to the appraisal, we do have some file material from both appraisers. David Stewart, Balboa's appraiser, seemed unwilling to do anything without Balboa's approval. An insurance company should not control its appraiser.

The 1943 New York Standard fire policy requires parties to choose "a competent and disinterested appraiser." Although "disinterested" is omitted from the Balboa policy here, the Standard policy controls. An appraiser cannot function in a disinterested fashion if he is constantly under the thumb of a party.

Failing to go forward with the appraisal is not reasonable conduct by Balboa. The policy clearly makes appraisal the preferred method of sorting out the amount of loss under the policy. Once a party demands appraisal, the other party must participate unless relieved of the appraisal obligation by a court of law. It is not reasonable conduct for a party to participate in a dispute resolution process and then walk out before the process is completed.

Balboa was unreasonable in failing to communicate about the appraisal. When Balboa decided to leave the table, it should have communicated immediately with all involved. Instead, both appraisers continued to work and continued to bill their clients. Balboa's handling of the appraisal failed to

consider Collazo's interests equal to its own.

## VI. CONCLUSION

This should not have been a difficult claim to adjust. There was no claim for loss of contents, and no claim for living expenses or loss of use. The house was not burned to the ground, so adjusters could see the damage, and see what materials were used in the house.

The fire was clearly accidental and covered. There was no coverage problem to overcome, with the possible exception of Balboa's imaginary coverage defenses based on Ms. Collazo's status as an additional insured.

Despite that, more than four years has elapsed since the fire and the claim is still in appraisal. Balboa's substandard adjusting practices caused the delay.

Gary Will

---------------------------------------

GARY WILLIAMS WSBA 9580

# EXHIBIT F

Page 1

UNITED STATES DISTRICT COURT WESTERN DISTRICT OF

WASHINGTON AT SEATTLE

ELISE G. COLLAZO,                    )
                                     )
              Plaintiff,             )
                                     )
    vs.                              )   No. CV13-00829 JCC
                                     )
BALBOA INSURANCE COMPANY,            )
                                     )
              Defendant.             )

Deposition Upon Oral Examination

of

DEAN PERRYMAN

9:45 a.m.

March 3, 2014

705 Second Avenue, 17th Floor

Seattle, Washington

Carolyn L. Coleman, RPR, CCR

Page 114

```
 1        A.    Yes.

 2        Q.    Has it been cordial and professional?

 3        A.    As much as Bud is.

 4        Q.    Have you gotten into disputes with Bud Dyer

 5   before?

 6        A.    I believe so.  But mostly it tends to be

 7   part of his MO, especially if the client is in the room

 8   type of thing.

 9                    (Exhibit No. 12 marked

10                     for identification.)

11        Q.    You've been handed Exhibit No. 12.  It's an

12   Aspirant Consulting Group estimate by Bernie Williams.

13   Have you ever seen this before?

14        A.    No.  I saw part of it this morning but I

15   don't remember -- I know the diagrams weren't included

16   with it and there were no photos.

17        Q.    So you saw part of this document this

18   morning and that was the first time you had ever seen

19   this document, correct?

20        A.    Yes.

21        Q.    Could you go to Page 64.

22        A.    Okay.

23        Q.    Before I ask you questions about this page,

24   did anybody ever tell you about this estimate?

25        A.    I had heard verbally there was an estimate
```

Page 131

1    think the carpet and pad had been laid over it.

2            And then on the -- up in the attic, I want

3    to say that was unfinished but I'm not sure.  I would

4    have to look again.  And I can't say as to the species

5    of wood.

6        Q.    Okay.  In order to have the most accurate

7    possible estimate of the cost of repairs, would you have

8    liked to have been shown this Aspirant estimate?

9        A.    I would have liked to have met them out

10   there to walk through it.

11       Q.    What do you think would have happened if you

12   and Mr. Williams, who wrote this estimate, had met out

13   there and walked through it?

14       A.    Hopefully, we would have worked toward an

15   agreed scope and specification of repair.

16       Q.    When you say "walk through it," you mean go

17   through the house and go through each item in the

18   estimate in thorough detail to determine what's correct

19   and what's not correct?

20       A.    We would have hopefully been able to walk

21   through the house and agree on the repair technique and

22   the materials and also the scope of repair, how much of

23   what was being done.

24       Q.    Is it likely that you and he would have then

25   sent each other amended estimates to try and reach that

```
 1                    C E R T I F I C A T E

 2    STATE OF WASHINGTON      )
                               ) SS.
 3    COUNTY OF KING           )
             I, the undersigned Washington Certified Court
 4    Reporter, pursuant to RCW 5.28.010 authorized to
      administer oaths and affirmations in and for the State
 5    of Washington, do hereby certify:

 6           That the annexed and foregoing deposition
      consisting of pages 1 through 180 of the testimony of
 7    each witness named herein was taken stenographically
      before me and reduced to typed format under my
 8    direction;

 9           I further certify that according to CR 30(e) the
      witness was given the opportunity to examine, read and
10    sign the deposition after the same was transcribed,
      unless indicated in the record that the review was
11    waived;

12           I further certify that all objections made at the
      time of said examination to my qualifications or the
13    manner of taking the deposition or to the conduct of any
      part have been noted by me upon each said
14    deposition;

15           I further certify that I am not a relative or
      employee of any such attorney or counsel, and that I am
16    not financially interested in the said action or the
      outcome thereof;
17
             I further certify that each witness before
18    examination was by me duly sworn to testify the truth,
      the whole truth and nothing but the truth.
19
             I further certify that the deposition, as
20    transcribed, is a full, true and correct transcript of
      the testimony, including questions and answers, and all
21    objections, motions, and exceptions of counsel made and
      taken at the time of the foregoing examination and was
22    prepared pursuant to Washington Administrative Code
      308-14-135, the transcript preparation format
23    guidelines;

24           I further certify that I am sealing the
      deposition in an envelope with the title of the above
25    cause and name of the witness visible, and I am
```

Page 183

1   delivering the same to the appropriate authority;

2        I further advise you that as a matter of firm
    policy, the Stenographic notes of this transcript will
3   be destroyed three years from the date appearing on this
    Certificate unless notice is received otherwise from any
4   party or counsel thereto on or before said date;

5        IN WITNESS WHEREOF, I have hereunto set my hand
    and affixed my official seal this 11th day of March,
6   2014.

7

8

9

10  CAROLYN L. COLEMAN, RPR, CCR
    Washington State Certified Court
11  Reporter
    License No. 2577

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Electronically signed by Carolyn Coleman (301-305-325-0923)                    8036399d-d6c3-4e8c-891b-e1ab7ec2b22c

The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT WESTERN DISTRICT OF
WASHINGTON AT SEATTLE

| | |
|---|---|
| ELSIE G. COLLAZO, | **NO. CV 13-00892 JCC** |
| Plaintiff, | |
| v. | **(Proposed) ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT RE: VIOLATIONS OF THE INSURANCE FAIR CONDUCT ACT AND CONSUMER PROTECTION ACT** |
| BALBOA INSURANCE COMPANY, an insurance company, | |
| Defendant. | |

This matter having come on regularly for hearing before the Court on Plaintiff's Motion for Partial Summary Judgment re: Violations of the Insurance Fair Conduct Act and Consumer Protection Act, and the Court having reviewed the records and files in support and opposition to that motion, and being otherwise fully advised in this matter, NOW, THEREFORE,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that Plaintiff's Motion for Partial Summary Judgment re: Violations of the Insurance Fair Conduct Act and Consumer Protection Act is GRANTED and the following rulings are made:

1)   Balboa violated WAC 284-30-330(7) when it compelled Collazo to institute the

(Proposed) ORDER GRANTING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT RE THE IFCA
AND CPA — 1

NO. CV 13-00892 JCC

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW
SUITE 480
MOUNTLAKE TERRACE, WA 98043
425.582.5636

appraisal clause and file this lawsuit in order to obtain substantially more money than what Balboa had offered during the subject insurance claim.

2)   Balboa violated WAC 284-30-330(3), 330(14), and 360(2) when it knowingly refused to respond a letter of representation from Collazo's public adjuster, Bud Dyer, thereby preventing him from assisting in the resolution of her insurance claim.

3)   Balboa's unreasonable denial of benefits and violation of the WAC insurance regulations constituted a violation of the Washington Insurance Fair Conduct Act (IFCA).

4)   Balboa's violation of the WAC insurance regulations constituted a violation of the Washington Consumer Protection Act (CPA).

Dated this _____ day of _____, 2014.

_____
The Honorable John C. Coughenour

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW
SUITE 480
MOUNTLAKE TERRACE, WA 98043
425.582.5636

Presented By:

JOEL B. HANSON, ATTORNEY AT LAW, PLLC


_____ /s Joel Hanson _____
Joel B. Hanson, WSBA #40814
Attorney for Plaintiffs

(Proposed) ORDER GRANTING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT RE THE IFCA
AND CPA — 3

NO. CV 13-00892 JCC

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW
SUITE 480
MOUNTLAKE TERRACE, WA 98043
425.582.5636

The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ELSIE G. COLLAZO, | NO. CV 13-00892 JCC |
| Plaintiff, | |
| v. | **CERTIFICATE OF SERVICE** |
| BALBOA INSURANCE COMPANY, an insurance company, | |
| Defendant.. | |

Under penalty of perjury under the laws of the State of Washington, I declare that on this 19th day of November, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system with which will send notification of such filing to the following:

Robert May
Tessan Wess
Smith Freed & Eberhard
111 SW 5th Ave. Suite 4300
Portland, OR 97204
P: 503.227.2424 | F: 503.227.2535
rmay@smithfreed.com
twess@smithfreed.com

Sonia Chakalo

CERTIFICATE OF SERVICE — 1

LAW OFFICES OF
MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE,
WA 98043
425/835-1619; FAX: 206/971-5080